Ellen LIEBER and Glen Vinton, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

MACY'S WEST, INC., Defendant.

No. C96–2955 MHP.

United States District Court, N.D. California.

Oct. 28, 1999.

Laurence W. Paradis, Disability Rights Advocates, Oakland, CA, for Plaintiffs.

Linda S. Husar, Thelen Reid & Priest LLP, Los Angeles, CA, Thomas M. McInerney, Deborah J. Broyles, Thelen Reid &

Priest LLP, San Francisco, CA, David Copus, Jones Day Reavis & Pogue, Washington, DC, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PATEL, Chief Judge.

Plaintiffs are persons with disabilities who have asserted a number of barriers to access at Macy's Union Square department store. Some of the barriers alleged in this action are inaccessible merchandise sales counters (referred to by Macy's as "cashwraps"), inaccessible fitting rooms, inaccessible restrooms, blocked main or secondary aisles, and a number of other miscellaneous access barriers. However, the central issue in the case concerns the extent to which Macy's provides enough clearance between display units for people with certain mobility disabilities, such as wheelchair users, to access the merchandise on display.

The court conducted a bench trial in this action. Having considered the testimony and evidence presented at trial, the briefs of counsel, and for the reasons set forth below, the court now enters the following Findings of Fact and Conclusions of Law in accordance with its obligations under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. Proc. 52(c) (A judgment under Rule 52(c) "shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.").[1]

### FINDINGS OF FACT

1. Macy's Union Square is a landmark retail facility in San Francisco. Macy's Union Square consists of a Main Store occupying almost an entire city block and a Men's Store located across the street.

2. The Main Store contains eight levels and a basement which have display areas open to customers. The Men's Store has five floors each of which has display areas open to the public. Altogether Macy's Un-

ion Square contains 567,000 square feet of space, approximately 450,000 sq. ft. of which is currently used to display merchandise for sale to the public. The court notes that Macy's Union Square has recently undergone a major renovation project, affecting both the Main Store and the Men's Store. Macy's witnesses testified that this renovation was slated to cost over $130 million.

3. Macy's Union Square consists of multiple components. The pertinent portions for this action are known as the Old I. Magnin Building (now referred to as the North Building), the Allen and Balley Building, the Dorman Building, and the Main Store. Macy's witnesses testified that the Old I. Magnin Building was completed gutted except for the external shell, and rebuilt as a part of Macy's Main Store. From the fourth floor up, the new North Building has been incorporated into the Main Store. The court thus finds that all portions of the North Building are subject to the new construction/alteration standard.

4. Macy's witnesses testified that the Allen and Balley Building has been completely demolished, and that an entirely new structure is being built on its former site to be fully integrated with the Main Store. Thus, the court finds that all portions of the new structure on the site of the Allen and Balley Building are subject to the new construction/alteration standards

5. The Dorman Building has been part of the Macy's Union Square site for some time. However, Macy's witnesses testified that it is being completely remodeled in conjunction with the new construction at the Allen and Balley Buildings. This will affect the usability of the entire Dorman Building. Thus, the court finds that, upon completion of the major renovation project now taking place, all portions of the Dor-

---

1. Although the court has attempted to avoid commingling findings of fact with conclusions of law, any conclusions that are inadvertently labeled as findings (or vice versa) shall be considered "in [their] true light, regardless of the label that the … court may have placed on [them]." *Tri–Tron International v. Velto*, 525 F.2d 432, 435–36 (9th Cir.1975).

man Building will be subject to the new construction and alteration standards.

6. The court specifically finds that the following additional portions of both the Men's Store and the Main Store Macy's Union Square (hereafter "areas of alteration") have been altered so as to affect their usability:

(A) Based on the testimony of Vincent Heitzmann, Director of Construction for Federared Stores, floors 2–4 of the Men's Store have been altered in their entirety.

(B) Based on the testimony of Heitzmann, floor 1 of the Men's Store, has been altered in its entirety, except for the south-west corner.

(C) The lower level of the Men's Store in the areas containing the Mossimo Department, the Calvin Klein Department, the Silver Tab Department, the Nike Shop, and the Calvin Klein Shop, as well as the route to such areas, and the restrooms on the lower level (which serve areas of alteration) have been altered.

(D) Based on the testimony of Andrew Brezina, Director of Store Planning for Federated, floor 2 of the Main Store in the Junior Dresses has been altered in its entirety.

(E) Based on the testimony of Brezina, floor 4 of the Main Store in the Junior Dresses area has been altered.

(F) All portions of the North Building that are currently open to the public have been altered.

(G) All portions of the Allen & Balley Buildings that are open to the public have been altered.

Plaintiffs established that numerous barriers to access still exist at Macy's Union Square. Such barriers include restrooms with various features mounted at heights that exceed ADAAG's reach requirements (including toilet paper dispensers, towel dispensers, soap dispensers, and seat cover dispensers); lack of proper signage at entry doors; locking devices that require grasping, pinching, or twisting of the wrist; and other features that affect the usability of the restroom for people with mobility disabilities. Plaintiffs also established that numerous fitting rooms which purport to be accessible contain features that fail to conform to ADAAG requirements, such as benches that are not 24″ by 48″, and door handles that require tight grasping.

7. The court finds that Macy's conceded that removal of many of these barriers was readily achievable. Martin Gusky, the Vice President of Properties for Macy's West, testified that he recently reviewed the barriers described by Mr. Margen, in consultation with an access expert hired by Macy's for the purposes of this litigation. Mr. Gusky testified that, based on such review, he initiated plans to remove most of the barriers described by Mr. Margen (other than cash wraps and crowded pathways) within two months of the date of the trial.

8. Overall, the court finds that, despite limited efforts to remove barriers at Macy's Union Square, multiple and pervasive access barriers still existed at the time of trial. With regard to many of the barriers that are structural in nature, such as inaccessible fitting rooms, restrooms, bridal registries and elevation changes, the court notes that, at trial, Macy's announced new plans to remedy such barriers.

9. Plaintiffs also presented credible evidence that Macy's has repeatedly blocked even the main and secondary aisles (those leading between pads) by placing merchandise displays in the aisles so as to constrict the paths of travel to less than 36″ wide. Various plaintiffs and class members testified that they have difficulty getting from the main store entrance to the elevators because of such obstacles. Defendant presented no explanation or justification for the presence of such barriers, and did not claim it was not readily achievable to remedy them. Accordingly, the court finds that Macy's failed to make adequate efforts under the readily achievable standard to maintain even the main and secondary

aisles in an accessible condition at all times.

10. In areas of alteration, Macy's is also required to maintain at least one 36″ accessible route to all fitting rooms and cash wraps, regardless of whether such routes pass through merchandise areas. Plaintiffs established that Macy's has failed to maintain 36″ accessible routes to fitting rooms and cashwraps in areas of alteration. Peter Margen identified numerous pathways in altered areas of the Men's Store in which routes to fitting rooms and cashwraps were blocked by moveable merchandise display units.

11. While Macy's witnesses clam that they seek to maintain accessible routes to fitting rooms and cashwraps, this testimony is not credible, since Macy's did not present or name any person at the Union Square Store who directly accepts responsibility to maintain such pathways. Macy's Director of Stores, Rebecca Canfield, who previously served as the store manager of Macy's Union Square indicated that this issue has never been addressed by any Macy's or Federated policy, or even by a memo.

12. Throughout the display areas, most of the merchandise is placed on racks, shelves and other structures designed to hold and display the merchandise. Some of these structures such as shelving are clearly attached to walls as are heavy display counters called "caselines". Mr. Heitzmann testified that case lines are fixed, despite the fact that they are not physically attached to the floor. He indicated that they are considered fixed because they are "wired," or electronically attached to their locations on the floor. Macy's presented no evidence to contradict Mr. Heitzmann. The court thus finds that caselines are fixed so as to be subject to ADAAG § 4.1.3(12)(b) in all areas of alteration. Other various types of tables and display structures are moveable, according to Macy's personnel. These include a variety of metal racks variously called 2–ways (or T-stands), 4–ways, and rounders. Within the retail industry all of these display features, whether fixed or moveable, are termed "fixtures." To avoid confusion with the legal definition of a fixture in real estate law, however, the court will refer to all of the merchandise display features at issue here as "display units," a term utilized in the Americans with Disabilities Act Access Guidelines.

13. The merchandise display units throughout Macy's Union Square are generally "self service" such that customers are expected to obtain merchandise by independently browsing and/or searching through the display areas for an item that they wish to purchase, removing that item from the display unit on their own, and bringing the item to a cash register to process their purchase.

14. Although Macy's sales clerks (called "associates" by Macy's) are to some extent available to assist customers in locating and/or obtaining merchandise to the extent permitted by the clerk's other duties (such as processing purchases at the sales counter), Macy's admits that the Store is generally operated according to a self-service model.

15. Macy's merchandise display areas are generally organized according to departments, each of which focuses on a particular type of merchandise. Each department consists of one or more "pads" in which the merchandise is placed on display units.

16. "Main" and "secondary" aisles lead patrons into the facility from various entrances and from one pad to another. Macy's admits that the display units are generally positioned within the pads with a certain clearance between each unit for the purpose of enabling customers to get to the merchandise.

17. Ms. Canfield, who previously served as the store manager of Macy's Union Square, testified that Macy's practice generally is to try to provide 24″ to 30″ clear space between its merchandise display units.

18. Macy's stipulated at trial that a 30″ pathway was, in fact, unusable for various class members.

19. Ms. Canfield estimated that, at the time of trial, 15%—25% of the display units would have to be removed just to provide a 30″ clear space between all display units. In the Men's Store, Ms. Canfield testified that 5%–15% of the units likely would need to be removed to provide 30″ of clearance.

20. Defendant's professional floor planner, Kevin Ellis, the head of Macy's West Planning, Design and Construction Departments, testified that his departments use 36″ between display units as the standard. Once the facility is designed and constructed, however, he turns responsibility for maintaining clearance over to the store's operational personnel, such as Ms. Canfield.

21. Similar testimony was presented by Andrew Brezina, the head of Federated's planning and design department. Mr. Brezina's department is responsible for designing the layout of the display areas in newly constructed and renovated Federated Stores, including most of the Macy's Union Square Store which has been undergoing a comprehensive renovation. (The Men's Store renovation was completed in early 1997; the Main Store renovation was ongoing at the time of trial.) Mr. Brezina testified that he plans such layouts to provide 30″ to 36″ of clear space between the merchandise placed on units. He testified that this is a "comfort zone" required for customers to be comfortable shopping.

22. Mr. Brezina admitted that he had no control over the merchandise layouts once the operations people (such as Ms. Canfield) take control of the facility, and that he routinely observed unit layouts at Macy's Union Square that did not comport with the plans prepared by his planning and design departments.

23. Plaintiffs' expert, Peter Margen, documented numerous instances at the Union Square Store facility where pathways between merchandise racks in pads provided substantially less than 36″ of clear width. Pathways often start out with sufficient clearance and then narrow at one or more points due to a lack of organized layout within the pads.

24. Ms. Canfield initially claimed that this limited spacing was designed to provide a "comfort zone" for all shoppers, including wheelchair users. On cross-examination, Ms. Canfield admitted that the 24″—30″ spacing practice is based solely on her personal perception of the needs of able-bodied customers. In fact, she admitted that she has no idea how wheelchair users actually get to the merchandise display at Macy's Union Square and admitted in her deposition that wheelchair users would have difficulty accessing at least 25% of all the merchandise on display units even at the slowest time of the year when inventories are lowest. She further admitted that conditions get even more congested at the holiday season (Thanksgiving to New Years) when inventories are significantly higher.

25. Ms. Canfield testified that she had never consulted with Mr. Brezina, Federated's in-house expert on department store planning, and that she was unaware that he considered 30–36″ spacing to be necessary for able-bodied patrons to be comfortable.

26. Ms. Canfield testified that she is unaware of any formal policy or memo directing staff to maintain any minimum clearance between display units, and does not know if anyone within Macy's or Federated has gone through the Union Square store at any time to try to maximize the extent to which wheelchair users can get up to the merchandise on displays inside of pads, even without losing any selling space.

27. Ms. Canfield admitted that she doesn't know the extent to which her 24″–30″ standard is generally followed at the stores under her supervision.

28. Ms. Canfield testified that her unwritten policy of providing 24″ to 30″ between merchandise display racks has been

in effect since the 1980's. She testified that this policy has not been adjusted at any time, and specifically has not been modified in response to the Americans With Disabilities Act.

29. Macy's witnesses testified that the merchandising strategy at Macy's Union Square consists of placing all inventory on the selling floor when it arrives at the store, and requiring each department to "clear" all of its own inventory. Macy's personnel stated that the store generally does not use stock rooms to hold duplicates of items, nor does it generally use clearance outlets to dispose of items that are not selling at its mainline stores. Further, Macy's witnesses testified that Macy's Union Square does not· transfer merchandise from one store to another within the Macy's West chain, nor does it attempt to renegotiate inventory purchases with vendors, except on very rare occasion. Thus, according to Macy's personnel, when stock does not sell as well as expected, the merchandise generally remains on the floor even as more merchandise is delivered and placed out on displays.

30. The primary mechanism specifically described by Macy's for promoting inventory control is the use of price markdowns on inventory.

31. Various witnesses testified that certain of the display units utilized at the store are substantially more efficient in terms of holding more merchandise in a given area. Rounders generally hold the most merchandise in a given space, while tables and two-ways generally hold the least. Macy's personnel testified that many of the display units used at Macy's Union Square are chosen for the "look" they present to customers (i.e., the visual appeal) even though they are not the most efficient use of space.

32. Macy's vice president of floor planning, Kevin Ellis, admitted that Macy's occasionally uses high efficiency units, but generally relies upon less-efficient units. Macy's also utilizes display units provided by vendors apparently without evaluating the efficiency of the units.

33. The evidence thus indicates that Macy's could improve access at Macy's Union Square by changing the type of units used without necessarily reducing the amount of merchandise on display. The court does not find that Macy's must disregard all visual "look" in selecting display units. Rather, the court finds that Macy's must at least consider and evaluate the feasibility of alternative display practices given that the current practices systematically prevent many people with disabilities from even getting to the merchandise on display.

34. To the extent that Macy's witnesses claimed that they were obligated to place merchandise display units closer together than 30″ in order to maximize sales, the usefulness of this strategy is contradicted by their own in-house expert, Mr. Brezina. The evidence indicates that 30″—36″ clearance is the minimum spacing needed before the facility begins passing the point of diminishing returns.

35. Macy's presented no evidence at trial that it would lose sales if it increased its current merchandise display practices to provide 36″ between its merchandise display units. In fact, the evidence indicates that Macy's may already be past the point of diminishing returns, such that widening pathways might encourage shoppers who would otherwise be deterred from shopping at Macy's Union Square as much as they would if the store environment were less crowded.

36. The court notes that Federated in recent Annual Reports claims that its newest stores are designed to be more "open" and provide wider aisles in order to provide a more comfortable shopping environment (Trial Exhibit 143, Federated's 1997 Annual Report at 20443). Federated's 1995 Annual Report notes that "wider aisles ... enhance store vistas and the shopping experience." (Trial Exhibit 141 at 200333) Ms. Canfield admitted that she is not knowledgeable concerning Federat-

ed's overall store planning guidelines and was not even aware of these efforts by Federated to increase the openness of its newer stores.

37. Prior to trial, Macy's had designated several experts, including an economist and a retail consultant, to testify about the effects of widening the pathways inside the pads. At trial, however, Macy's chose not to call these experts and instead sought to rely on the testimony of two lay witnesses employed by Macy's—Rebecca Canfield, Macy's Director of Stores, and Liz Hauer, Macy's Head of Merchandise Planning—to discuss the potential impact of providing improved access at Macy's Union Square. The testimony of these witnesses on this issue, however, was purely speculative.

38. Neither Ms. Canfield nor Ms. Hauer had looked at the effect of widening the pathways inside merchandise pads until the middle of the trial. Ms. Canfield admitted that, prior to trial, she had never made any effort to assess the potential impact of widening the pathways inside the pads to improve access. The only effort she made to address this issue was a one-time, 1–3 hour visit during the trial when she went to Macy's Union Square in the company of Macy's attorneys, and made some mental "guesstimates" of the potential effects of widening the pathways inside the store to 30 inches between the units. These mental guesstimates, however, were too speculative to be probative.

39. Ms. Canfield also claimed that any reduction in the amount of merchandise displayed on the sales floor would necessarily have an equivalent effect on sales volume at the store. This testimony, however, was also too speculative to be probative. Ms. Canfield admitted that she had no knowledge of any empirical study designed to assess how widening pathways at Union Square (or any other store) would affect sales, and she had never even looked at the operations and/or financial performance of other department stores that do provide access for people with mobility disabilities.

40. Ms. Canfield's sole professional experience is in the hands-on management of several Macy's stores. She holds no professional degrees in economics or retailing and has never done any studies or written any articles concerning retailing. It is undisputed that Macy's has never tried reducing the density of merchandise displays at an existing store to improve shopper access or comfort. Ms. Canfield thus has no direct experience upon which to base any opinions concerning this issue. Moreover, prior to trial, Ms. Canfield had never even considered this issue, much less analyzed or investigated it in any formal manner.

41. Any proper study or investigation of this issue would have to consider the extent to which shoppers, both able-bodied and disabled, would be more likely to shop more often at Macy's if the environment were more comfortable and accessible.

42. From all the evidence, the court finds that Macy's generally does not make any significant effort to adjust the layout of the display units so as to maximize access even without changing or losing any units, and ignores this basic access requirement under the ADA barrier removal requirements

43. Ms. Canfield also assumed that any reduction in merchandise on the floor would lead to reduced sales, without considering the ability of Macy's to increase utilization of stock rooms to store duplicates. Ms. Canfield made no analysis of the potential positive effects of having fewer duplicates out on display in terms of shopper satisfaction and resulting increased sales. Ms. Canfield claimed that utilizing stock rooms would lead to some increased labor costs, but made no effort to try to quantify this. She also ignored certain factors that might off-set such labor costs, such as increased sales to customers who would shop more often in an uncluttered, comfortable environment. Different stock planning and display practices might also reduce the extent to which Macy's has to mark down inventory in

order to clear it from the floor and make room for new deliveries. Defendant's witnesses admitted that Macy's has to mark down substantial portions of its merchandise in order to clear it from the floor, thus losing substantial opportunities for improved revenue.

44. Ms. Canfield admitted that Macy's also uses stockrooms to some extent and admitted that Macy's could increase the extent to which such stockrooms are used to hold duplicate merchandise rather than putting all of the merchandise in a shipment out on the floor. She also admitted that Macy's has in the past utilized stockrooms to a greater extent than currently used at Macy's Union Square. However, she made no analysis of the effect on Macy's operations of increasing the use of stockrooms to hold duplicate merchandise in order to reduce the crowding of the sales floor. As noted above, this court does not suggest that Macy's is required to adopt the specific methods that have been implemented at Nordstrom's. However, the Nordstrom's example remains instructive, particularly in light of the testimony by Macy's witnesses that the use of stockrooms at Macy's is currently in flux and Federated's admission that it is constantly experimenting with new merchandising strategies.

45. Ms. Hauer, Head of Merchandise Planning, also claimed that any reduction in the amount of merchandise out on display would have a proportional negative effect on Macy's overall sales. Ms. Hauer, however, also admitted that she has never done any study or investigation of this issue Ms. Hauer testified that she had no experience with any Macy's store, or even any department in a Macy's store, where the actual density of the merchandise display area had been reduced in terms of the amount of merchandise displayed in a given space. She, too, admitted that there is a point of diminishing returns beyond which adding more merchandise to a display area would lead to overcrowding such that total sales will actually be reduced. In her deposition, Ms. Hauer admitted repeatedly that she did not know whether or not Macy's Union Square was already beyond that point of diminishing returns. She also claimed in her deposition that she could estimate whether or not the Union Square store was over-crowded based on her experience in developing stock plans, but no evidence was presented by defendant to support this claim. In fact, Ms. Hauer admitted that she had no actual knowledge of display area conditions at Macy's Union Square and that she would have to guess on the issue of whether widening pathways within the store to 36 inches would even require removing units.

46. Ms. Hauer further admitted that she had no knowledge concerning the extent to which Macy's Union Square is actually using its display area to maximum efficiency. She admitted that she never investigated to see what the effect would be of widening the pathways in Union Square so that wheelchair users could get to the merchandise. She was also unaware of anyone within Macy's who had made any such investigation.

47. Ms. Hauer also claimed that crowding of the floor in Macy's stores was necessary due to defendant's six-month planning cycle in which defendant purchases inventory to be delivered at future dates. Ms. Hauer claimed that, to the extent merchandise does not sell as well as expected, the floor inevitably gets more crowded.

48. The court notes that defendant engaged and disclosed an economist and retail consultant to testify on these issues at trial. The court finds defendant's decision at trial not to call these expert witnesses and instead to rely solely on lay witnesses is revealing. Under these facts, the court may infer that defendant's decision not to call its expert witnesses means that their evidence would not have supported defendant's case.

49. Overall, the court finds that Macy's has failed to make any effort to modify or even review its stock planning and display practices to assess the feasibility of alternative methods that would improve access. Ms. Canfield failed to do a reliable analysis

of the potential economic effects of widening the pathways inside the pads, and her testimony on the issue was thus speculative.

50. Macy's asserted as a defense at trial that it provides customer service to the extent it fails to provide actual physical access to merchandise for patrons with disabilities. However, the court finds that Macy's presented no credible evidence to sustain this defense.

51. The plaintiffs and class members all testified credibly that they generally have difficulty just getting the attention of sales clerks at Macy's Union Square and rarely, if ever, are able to get adequate customer assistance.

52. The court also notes that Macy's failed to produce any witness to testify the extent to which Macy's actually provides customer service as an alternative to direct access to merchandise. In the middle of trial, Macy's determined that it would not call Patricia Stromberg, the person in charge of training sales associates, despite the fact that she had previously been identified as a potential witness on the role of service in providing access to patrons with disabilities. The court finds, based on the facts, that Ms. Stromberg's testimony would have not have benefited Macy's. Ms. Stromberg was within Macy's power to produce at trial, and would have been expected to testify if her testimony would have been favorable.

53. Instead of producing a witness directly knowledgeable on the issue of customer service, Macy's chose to rely again on the testimony of Rebecca Canfield, who admitted that she did not have any direct knowledge of the substance of the training program for sales associates. Ms. Canfield further testified that she was not aware of any training given to sales associates specifically with regard to providing assistance for customers with disabilities. Ms. Canfield admitted that sales clerks frequently have to serve many customers all at the same time.

54. Through Ms. Canfield, Macy's presented a plan being developed to institute necessary procedures to insure a minimal level of access for disabled customers. Under the plan, Macy's was to consider designating a store manager to be responsible for providing access to customers with disabilities. Macy's was also reviewing the possibility of installing customer service phones and signage instructing disabled customers to call for assistance.

55. Macy's witnesses have further testified that their use of "vendor shops" prevents them from controlling merchandise density. However, Macy's presented no evidence that it attempts to provide for access in its contractual arrangements with vendors. Macy's further presented no credible evidence that vendors would actually refuse to provide merchandise for sale at Macy's if access standards were included in the vendor shop agreements. Macy's Director of Store Planning, Mr. Brezina, admitted that Macy's retains ultimate control over spacing of displays, even in vendor shops. The court finds that Macy's cannot, and has not, ceded control over its floor areas to the point of denying access simply in order to maintain contractual advantages from vendors.

## CONCLUSIONS OF LAW

### A. Jurisdiction

1. This court has primary jurisdiction over this matter pursuant to 28 U.S.C. § 1331. The court has supplemental jurisdiction over the California state law claims pursuant to 28 U.S.C. § 1367.

2. Macy's is a "place of public accommodation" under the operation of the Americans with Disabilities Act ("ADA"). 28 C.F.R. § 36.104. Macy's Union Square is owned and operated by Macy's West, Inc., a wholly-owned subsidiary of Federated Department Stores. Macy's Union Square is subject to all requirements of a public accommodation under Title III of the Americans with Disabilities Act ("ADA") of 1990, 42 U.S.C. § 12101, *et seq.* Civil Code §§ 54, *et seq.* (California's "Disabled Person's Act") and Title 24 of

the California Code of Regulations ("Title 24").

3.  The Americans with Disabilities Act ("ADA") is a comprehensive civil rights law for people with disabilities. In enacting the ADA, Congress sought to remedy discrimination in public accommodations whether such discrimination is intentional or not. 42 U.S.C. § 12101(a); *Helen L. v. DiDario*, 46 F.3d 325, 335 (3rd Cir.1995).

4.  Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability" in places of public accommodation. 42 U.S.C. § 12182(a) (1994). The ADA further defines "discrimination" as a failure to remove "barriers ... where such removal is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv) (1994).

5.  California has similar disability rights legislation embodied in Cal. Civil Code §§ 54, *et seq.* Cal. Civil Code § 54 reads: "... disabled persons shall have the same rights as the able bodied to the full and free use of ... public facilities and other public places." Section 54.1 provides that persons with disabilities are "entitled to full and equal access, as other members of the general public, to accommodations, advantages, facilities and privileges of ... places of public accommodation, amusement, or resort, and other places to which the general public is invited."

## B.  Access in Areas of New Construction And Alteration

6.  With respect to renovations in places of public accommodations, the ADA and Title 24 both impose heightened access requirements in areas subject to new construction or alterations.

7.  Areas of Macy's Union Square that were and are being renovated are subject to the new construction/alterations standards of the ADA and Title 24. Under these regulations, Macy's has an obligation to remove various barriers in such renovated areas regardless of whether such

barrier removal was otherwise "readily achievable."

8.  The regulations promulgated under Title III define an alteration as a "change to a place of public accommodation or a commercial facility that affects or could affect the usability of the building or facility or any part thereof." 28 C.F.R. § 36.402(b). If an alteration takes place, those portions of the facility which have been altered must comply with Appendix A of 28 C.F.R. § 36, the Americans with Disability Act Access Guidelines ("ADAAG"). 28 C.F.R. § 36.402(b)(2).

9.  ADAAG standards are applied strictly in areas of alteration, except as set forth in limited exceptions in the text of ADAAG itself. ADAAG § 4.1.6 *et seq.* All areas that are being affected should be made fully accessible to and usable by people with physical disabilities. 42 U.S.C. § 12183. In public accommodations that have been altered, discrimination against people with disabilities is established by a "failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." 42 U.S.C. § 12183(a)(2).

10. Where the California access standards provide greater accessibility than ADAAG, the California standards control. 42 U.S.C. § 12201(b).

11. In California, access in altered facilities is governed by the standards set forth in Title 24 of the California Code of Regulations (also known as the California Building Code, hereinafter "Title 24"). Title 24 § 1134B.2. Title 24 requires that "barrier-free design" be incorporated in all new and altered buildings, facilities, site work and other developments "to ensure that they are accessible to and usable by persons with disabilities." Title 24 § 101.2; *see Donald v. Cafe Royale*, 218 Cal.App.3d 168, 178, 266 Cal.Rptr. 804 (1990).[2]

---

**2.** Plaintiffs also assert that Macy's failure to provide access in areas of alteration violates

California Health & Safety Code §§ 19955, et seq.

12. California state law also protects the right to access in places of public accommodation through the equal access mandate of Civil Code §§ 54, *et seq.* California Civil Code §§ 54, *et seq.* provides that people with disabilities "shall have the same right as the able-bodied to the full and free use of ... public buildings," and guaranteeing "full and equal access, as other members of the general public, to accommodations, advantages, facilities, and privileges" of places of public accommodation Cal. Civ.Code § 54.1.

13. The court finds that the portions of Macy's Union Square referred to above in the Findings of Fact have been altered or serve areas of alteration within the definition of the ADA and Title 24.

## C. Fitting Room And Cashwrap Access in Areas of Alteration

14. ADAAG requires "dressing and fitting rooms ... [to] be on an accessible route." ADAAG § 4.35. Similarly, accessible cashwraps "shall be on an accessible route," and such accessible cashwraps are required to be dispersed throughout the facility. ADAAG § 7.2(1).

15. Macy's witnesses testified that no one is responsible for ensuring 36″ accessible routes to fitting rooms and cashwraps in areas of renovation. Moreover, Peter Margen identified multiple pathways to fitting rooms and cashwraps that were not maintained at 36″ in the areas of alteration within the Men's Store. Thus, the court finds that Macy's failure to maintain accessible routes to fitting rooms in areas of alteration violates ADAAG § 4.35, and Macy's failure to maintain accessible routes to cashwraps in areas of alteration violates ADAAG § 7.2(1).

16. The court notes that ADAAG requires department stores specifically to provide "one of each type" of sales counter with a portion that does not exceed 36″ in height. ADAAG § 7.2(1). Title 24 requires all sales counters in areas of new construction/alteration to be accessible. "Sales employee work stations shall be located on accessible levels, and the cus-tomer side of sales or check-out stations shall be accessible." Title 24 § 1110B.1.2. However, unlike the succeeding section governing checkstands, there is no explicit provision in the section on mercantile occupancies regarding what constitutes an "accessible" sales or check-out station. The court finds therefore that cashwraps located in areas of alteration either must meet the 36″ height requirement or else must have a clipboard or other mechanism consistently made available to customers with disabilities to ensure accessibility.

17. As to the fitting rooms, ADAAG requires that every accessible dressing room provide a 24″ by 48″ bench fixed to the wall and accessible features such as a 24″ by 48″ bench or lowered clothing hooks. ADAAG §§ 4.35.1, 4.35.4; Title 24 § 1110B.1.7. Title 24 requires "at least" one fitting room provided for male or female customers be accessible to persons with disabilities. Title 24 § 1110B.1.7. In addition, clothing hooks shall be located "no greater than 48 inches [ ] from the floor." The court finds that the fitting rooms identified by Peter Margen failed to meet these ADAAG and Title 24 standards governing accessible fitting rooms.

## D. Miscellaneous Access Issues in Areas of Alteration

18. *Entrances:* The ADAAG and Title 24 contain highly detailed regulations requiring that entrances serving areas of alteration be accessible. *See* ADAAG § 4.13 and § 4.1.6(2); Title 24 § 1001 and § 1004. The court finds that the entrances to Macy's Union Square stores identified by Mr. Margen violate ADAAG and Title 24 standards governing accessible entrances.

19. *Changes in elevation within a floor level within areas of alteration:* ADAAG provides that "[i]f an accessible route has changes in level greater than ½ inch, then a curb ramp, ramp, elevator, or platform [ ] shall be provided." ADAAG § 4.3.8. Furthermore, ADAAG provides that certain standards be met with regard to

changes in floor level, including change (I) up to ½ inch [ ] may be vertical and without edge treatment; (ii) changes in level between ¼ inch and (iii) ½ inch [ ] shall be beveled with a slope no greater than ½; and changes in level greater than 1:20 shall be accomplished by means of a ramp. ADAAG 4.5.2. Similarly, Title 24 requires that "floors of a given story shall be common level throughout." Title 24 1120B.1. The court finds that the floors identified by Margen in his testimony as having changed elevation levels are in violation of ADAAG and Title 24 standards.

20. *Inaccessible ramps serving areas of alteration:* ADAAG provides that "any part of an accessible route with a slope greater than 1:20 shall be considered a ramp" and shall provide "the least possible slope" (with the maximum slope for a ramp in new construction being 1:12). ADAAG § 4.8.1–2. Title 24 requires that the maximum slope of a ramp that "serves any exit way, provide access for persons with physical disabilities, or is in the path of travel shall be 1–foot (305 mm) rise in 12 feet (3658 mm) of horizontal run." Title 24 § 1007.3a. Additionally, Title 24 states that slopes located within an accessible route of travel "shall not be steeper than 1 unit vertical in 12 units horizontal (8.33% slope)," while the slope of other ramps "shall not be steeper than 1 unit vertical in 8 units horizontal (12.5% slope)." Title 24 § 1007.3. The court finds that the ramps serving the entrances to Macy's Main Store are in violation of ADAAG and Title 24 standards governing ramps.

21. *Non-compliant features in restrooms:* The regulations governing accessible features in restrooms are highly detailed and address such restroom features as toilet stall doors, signage, door hardware, and soap dispensers. *See* ADAAG § 4.22; Title 24 § 1115B.7, *et seq.* Mr. Margen testified that many of the restrooms he inspected contained inaccessible features. The court finds that the rest-

rooms identified by Mr. Margen failed to meet ADAAG and Title 24 standards for accessible restrooms.

22. *Inaccessible pay phones:* ADAAG requires public telephones to have "a maximum high forward reach [of] 48 inches." ADAAG § 4.2.5. Title 24 imposes a different standard requiring the reach range for public telephones to be "no higher than 54 inches." Title 24 § 1117B.2. Mr. Margen testified that during his site inspection of Macy's Union Square, he observed public telephones with reach ranges that exceeded the 54 inches. The court finds that the public telephones that Mr. Margen identified are in violation of ADAAG and Title 24 standards for accessible public telephones.

23. *Self-service computer terminals:* ADAAG requires that controls and operating mechanisms be accessible. ADAAG § 4.27.1. Specifically, ADAAG states that controls and other operable equipment "shall be placed within forward reach of no more than 48 inches, with a maximum high side reach of 54 inches." ADAAG § 4.27.3; § 4.2.5; § 4.2.6. Mr. Margen testified that during his site inspection of Macy's Union Square, he observed self-service terminals, such as bridal registry computer terminals, that exceed the maximum high-reach range. The court thus finds that the self-service computer terminals identified by Mr. Margen are in violation of the applicable ADAAG regulations.

**E. Access to Merchandise in Areas of Alteration—Fixed Displays** [3]

24. ADAAG § 4.1.3(12)(b) states that "shelves or display units allowing self-service by customers in mercantile occupancies shall be located on an accessible route complying with § 4.3." An accessible route is defined as being 36″. ADAAG § 4.3.3. These standards apply to all fixed display units in areas of alteration, including all perimeter fixtures and caselines.

3. Access to moveable displays both in areas of renovation and in areas of current construc-

tion is discussed in detail in section II.

25. Ms. Canfield admitted that Macy's goal is to provide 24–30″ pathways to and between all units, including perimeter fixtures and caselines in areas of alteration. The court finds that this practice violates ADAAG § 4.1.3(12)(b).

## II. *Areas of Current Construction*

### A. Burden of Proof

26. The Americans with Disabilities Act, enacted in 1990, requires places of public accommodation such as Macy's Union Square to remove barriers to the extent readily achievable 42 U.S.C. § 12182(b)(2). Continued efforts are required of places of public accommodation over time to remove any remaining barriers to the extent readily achievable. 42 U.S.C. § 12181(9); 28 C.F.R. § 36.304. The U.S. Department of Justice issued regulations pursuant to Title III of the ADA detailing such barrier removal obligations. 28 C.F.R. Part 36.

27. Plaintiffs bear the burden of establishing the existence of access barriers throughout Macy's Union Square. Plaintiffs also bear the burden of putting forward reasonable modifications. The burden then shifts to Macy's to show that the requested modifications would fundamentally alter the nature of its public accommodation. *Cf. Martin v. PGA Tour*, 994 F.Supp. 1242 (D.Or.1998) (demonstrating the burden shifting for affirmative defenses under the ADA).

### B. Access to Merchandise in Areas of Current Construction—Moveable Displays

28. The thrust of plaintiffs' argument as it relates to areas of current construction is that Macy's violates the ADA in regards to the placement of merchandise racks within the display pads. Plaintiffs testified at trial about their difficulties in obtaining access to merchandise at Macy's Union Square. The court was not persuaded by plaintiffs' video exhibit. Nor was the court convinced that access problems were as widespread and pernicious as plaintiffs complained. The court conclud-

ed from plaintiffs' anecdotal testimony as well as the testimony of plaintiffs' access expert that access problems vary in degree and also vary from department to department and over time. However, the court was persuaded that taken as a whole, plaintiffs' testimony demonstrated a pattern overall of lack of access which worsens at certain times of the year when Macy's increases its merchandise inventory.

29. The question remains then: what are Macy's obligations under the ADA in terms of providing access to moveable displays? The explicit language of the ADA, Department of Justice ("DOJ") ADA regulations, and the legislative history of the ADA uniformly indicate that the statute does not contemplate that customers in wheelchairs will have 100% physical access to merchandise at Macy's or at any other retail store. Section 302(b)(2)(A)(iv) of the ADA, 42 U.S.C. § 12182(b)(2)(A)(iv) (1994).

30. The ADA contemplates the likelihood that the removal of *all* barriers will not be "readily achievable." The ADA specifically states that where barrier removal is not "readily achievable," retailers should provide access to their merchandise "through alternative methods if such methods are readily achievable." 42 U.S.C. § 12182(b)(2)(A)(v) (1994).

31. Neither the ADA nor its implementing regulations contain any specific spacing requirement for moveable merchandise display racks. The regulatory spacing requirement for self-service merchandise units, the 36–inch requirement in 4.1.3(12)(b) of the ADA Guidelines for Accessible Design ("ADAAG"), applies to *fixed* display units. No provision of the ADA or DOJ regulations applies this 36–inch standard to *moveable* display racks. The ADA's "physical access" requirement does not mandate 36 inches of clearance on all sides of a moveable display rack, nor even on one side. ADAAG § 4.1.3.(12)(b). Therefore the spacing of moveable display racks is governed by the more general "readily achievable" standard of the ADA.

32. Nor are DOJ publications to the contrary. The DOJ publication *ADA Guide to Small Business* states that retailer must "provide a 36" minimum width route between displays and shelves if readily achievable." *Id.* (Emphasis added) (Ex. 135 at 200058).

33. The ADA defines "readily achievable" as "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). The ADA sets forth the following factors, among others, in deciding whether an action is to be considered readily achievable: (I) the nature and cost of the action; (ii) the overall financial resources of the facility involved and the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility; (iii) the overall financial resources of the covered entity, including the number of its employees; and (iv) the type of operation of the covered entity. 42 U.S.C. § 12181(9). The Title III regulations specify that if applicable the overall financial resources of any parent corporation or entity should also be considered. 28 C.F.R. § 36.104 (definition of "readily achievable"). The DOJ ADA regulations include rearranging tables and display racks among the examples of efforts that it considers to be readily achievable. 28 C.F.R. § 36.304(b).

34. DOJ regulations explain that "the rearrangement of temporary or movable structures, such as furniture, equipment or display racks is not readily achievable to the extent that it results in a significant loss of selling or serving space." Section 301(9) of the ADA, 42 U.S.C. § 12182(b)(2)(A)(iv) (1994); 28 C.F.R. § 36.304(f).

35. While Macy's has argued that the effect on its revenues of loss of selling space is relevant, the court does not concur. The "significant loss of selling space" standard is only meaningful to the extent that it affects operations. The ADA statute makes clear that the readily achievable barrier removal obligation must consider the "overall financial resources," "effect on

expenses and resources," and the "effect on operations" of the facilities involved in the action. 42 U.S.C. § 12181(9), ("Definitions"). Moreover, the Department of Justice ("DOJ"), which promulgated the Title III regulations, has interpreted the provisions dealing with reconfiguration of display racks as requiring the retailer to consider the effect on operations in determining the extent to which barrier removal is readily achievable. DOJ ADA Title III Technical Manual, Ex. 151 at p. 200693; DOJ Guide to Small Businesses, Ex. 135 at 200059.

36. The testimony offered by Macy's witnesses regarding the supposed loss of selling space was speculative. Defendant failed to present the testimony of their expert witnesses, relying solely upon the opinions of lay witnesses. The opinion testimony of Macy's lay witnesses was not probative. It was not based on more than "guesstimates" of the impact of providing more space between racks and the concomitant impact on selling space. There was an absence of any empirical or other studies or investigation into the feasibility of providing access.

37. However, the court finds that placing 36" between each display rack is not mandated by the ADA or by Title 24. Title 24 specifically regulates access to merchandise in areas of alteration "General sales, display, and office areas together with related toilet rooms shall be made accessible." Title 24 § 1110B.1.1. Additionally, "circulation aisles and pedestrian ways shall be sized according to functional requirements and in no case shall be less than 36" in clear width." Title 24 § 1110B.2.1.

38. Title 24 also specifically regulates aisles, which are defined as "circulation path[s] between objects such as seats, tables, *merchandise* equipment, *displays*, shelves, desks, etc." Title 24 § 202.3 (emphasis added). Such aisles are also required to have a clear width of at least 36." Title 24 § 1014.2.1.

39. Title 24, § 202. Section 1110B.2.1 of Title 24 is entitled "Circulation" and states that "Circulation aisles and pedestrian ways shall be sized according to functional requirements and in no case shall be less than 36 inches (914 mm) in clear width." A circulation path is defined as "an exterior or interior way of passage from one place to another for pedestrians, including, but not limited to, walks, hallways, courtyards, stairways and stair landings." Therefore, an aisle is essentially a pedestrian passageway that leads from one place to another between merchandise areas. Stated differently, the court finds that a circulation aisle or path is a pedestrian way where people travel as a means to get from one point to another, such as a hard-surfaced main aisle that leads from one merchandise pad to another, and not a discrete area within a merchandise pad, where customers browse to look at merchandise.

40. Congress did conclude that certain areas of a store will not be fully accessible to a customer in a wheelchair. However, the DOJ regulations state that in such instances "selected widening should be undertaken to maximize the amount of merchandise ... accessible to individuals who use wheelchairs." 56 Fed. Ref. 35538 (July 26, 1991). The evidence indicates that Macy's has failed to make any efforts to even selectively widen its pathways inside the pads. For example, none of defendant's lay witnesses even looked at whether Macy's could improve access inside the merchandise pads until the middle of trial.

41. The court concludes that the conditions within the merchandise pads at Macy's Union Square obligated Macy's to take steps to maximize access within those areas to the extent readily achievable, as specifically contemplated by the ADA. 28 C.F.R. § 36.304(b)(3)-(4).

42. Macy's Director of Stores testified at trial that Macy's practice and goal in operating the facility is to provide only 24"–30" clear space between merchandise display units. The evidence presented at trial showed that in fact clearances are at times substantially less than 24", with barely enough room for even able-bodied customers to squeeze through. The evidence shows that Macy's has never even tried to provide more accessible routes in merchandise pads. The court finds that Macy's admitted practice of providing only 24"–30" pathways between merchandise display units violates the requirement that accessible routes be provided in merchandise areas to the extent readily achievable.

43. In fact, the evidence presented supports the claim that it is readily achievable for Macy's to take steps to increase access within merchandise pads. First of all, Macy's own witness testified that access could be improved in many pads simply by adjusting the placement of merchandise display units.

44. The testimony of Macy's own Director of Design and Planning, Andrew Brezina, contradicts Macy's assertion that it cannot provide greater accessibility without adversely affecting its business operations. Mr. Brezina testified that he regularly sets out fixture plans providing 30–36" clearance between display units. He testified that this clearance is a comfort zone required even for able-bodied shoppers. To the extent Macy's is crowding the display areas by narrowing pathways below this comfort zone for able-bodied shoppers, Macy's may actually improve its operations by widening the pathways even if this required using different display units and/or reducing the total amount of merchandise on the display floor.

45. The barrier removal requirements of the ADA mandate that Macy's make efforts to improve access in merchandise display areas. Macy's has failed to even consider various alternative means of providing access such as those utilized by other department stores. Defendant has thus violated the ADA's requirement that places of public accommodation "take such steps as may be necessary" to provide access. 42 U.S.C. § 12182(b)(2)(A)(iii).

Defendant's witnesses admitted that they never even examined their merchandising practices to see if they could be modified to address the pervasive access barriers at issue.

46. While the court does not find that Macy's is obligated to follow the methodology of any other department store in providing access, the methods used by other stores are relevant as examples of alternative approaches. The evidence presented at trial concerning Nordstrom's, (a direct competitor of Macy's) showing its practice of providing 36″ pathways between merchandise display units by use of stockrooms, clearance centers, and more careful planning demonstrates that there are in fact alternate methods through which retail department stores can generally provide access without a significant burden or fundamental alteration.

47. The court further concludes that Macy's has violated its ADA obligations by failing to even consider alternative methods necessary to provide full and equal access. The ADA specifically requires public accommodations to modify their policies and practices where necessary for access, subject to the fundamental alteration defense. 42 U.S.C. § 12182(b)(2)(A)(ii). Federated's Annual Reports claim that Federated is constantly experimenting, trying new strategies, and adjusting to changing conditions. Yet defendant has done *nothing* to try to improve access to the merchandise inside the pads. It has not experimented with different methods, it has not tried adjusting its planning and display practices, it has not even tried to maximize access by simply repositioning existing display units in the pads to maximize access. Defendant has simply ignored the problem.

48. The court thus concludes that Macy's failure to make any effort to improve access within the pads violates the

requirement that readily achievable efforts be made to provide access. 42 U.S.C. § 12182(b)(2)(A)(iii).

## C. Customer Service Defense

49. The ADA requires the merchant to provide sales assistance to retrieve merchandise that is physically inaccessible. House Committee on Education and Labor, HR Rep. No. 485(II), 101st Cong., 2d Sess., at 110 (1990). Also, DOJ regulations state that "[e]xamples of alternatives to barrier removal include . . . [r]etrieving merchandise from inaccessible shelves or racks." 28 C.F.R. § 36.305(b)(2). The DOJ commentary published contemporaneously with its ADA regulations state "[I]f it is not readily achievable for a retail store . . . to rearrange display racks to provide accessible aisles, the store must, if readily achievable, provide a clerk . . . to retrieve inaccessible merchandise." 56 Fed.Reg. 35544, 35570, Vol. 56, No. 144 (July 26, 1991).

50. Contrary to the defense presented by Macy's, on all the evidence the court concludes that, at the time of trial, Macy's had not adequately provided access to merchandise pads through readily achievable "alternative methods" such as customer service. 42 U.S.C. § 12182(b)(2)(v). Under the readily achievable standard, Macy's is specifically obligated to provide service to people with disabilities as an alternative to access in any areas where it does not provide actual physical access to the merchandise offered for sale to the public. 28 C.F.R. § 36.305(b)(2).

51. Plaintiffs and class members testified that they were impeded in their ability to view merchandise they were interested in buying at Macy's Union Square because sales clerks were unable or unwilling to provide adequate service. The trial evidence indicated that while Macy's stated an intention to improve customer assistance to people with disabilities,[4] at the

---

4. At trial, Macy's presented a plan to institute necessary procedures to ensure assistance for disabled customers who cannot access the merchandise. Defendant was "considering" a plan to designate a person responsible for

assisting disabled customers, as well as installing customer service phone and signage instructing disabled customers to call for assistance.

time of trial it had taken insufficient steps to ensure that shoppers with disabilities actually get adequate assistance from sales clerks. Macy's witness on this issue, Rebecca Canfield, was aware of no special training given to sales clerks to assist disabled customers, and no procedures were in place to ensure that shoppers with disabilities actually receive adequate, or any, assistance obtaining items when the clerks are busy processing the purchases of other customers at the sales counter.

### D. Contractual Arrangements Defense

52. The ADA specifically prohibits public accommodations from discriminating against person with disabilities "through contractual . . . or other arrangements." 42 U.S.C. § 12182(b). Macy's claimed that the vendors would not "like" seeing merchandise adjusted between pads. Even if this were the case, the ADA clearly prohibits Macy's from maintaining access barriers that discriminate against patrons with disabilities through contractual arrangements with vendors. 42 U.S.C. § 12182(b). Moreover, Macy's failed to present any evidence of actual vendor contracts or testimony from any vendor showing that Macy's could not retain the flexibility to move merchandise display units as needed to provide access for people with disabilities.[5] Plaintiffs submitted evidence that competing department stores with vendor presences maintain accessible layouts. Thus, the court finds that Macy's contracts with vendors are no excuse for failing to provide greater access within vendor shops.

### E. Fundamental Alteration Defense

53. The ADA does not require Macy's to alter the fundamental nature of its business. 302(b)(2)(A)(ii) of the ADA (42 U.S.C. § 12182(b)(2)(A)(ii)).

54. The fundamental nature of Macy's business, and the essence of its role as a place of public accommodation, is to provide goods available for sale to the general public, including sale merchandise.

**5.** Mr. Brezina testified that Macy's retains

55. To the extent that defendant is claiming that providing improved access is not required because it would involve changing Macy's policies and practices, then defendant is required to meet the ADA's fundamental alteration standard, a higher standard than the readily achievable standard. 42 U.S.C. § 12182. Under this standard, Macy's must show that the nature of the goods and services it provides would in fact be fundamentally altered by providing changes needed to improve access. 42 U.S.C. § 12182(b)(2)(A).

56. While Macy's argues that the adoption of Nordstrom's strategy of removing clearance merchandise from the store would be a fundamental change to Macy's business, the court is not suggesting or requiring that Macy's adopt any particular strategy for providing additional access, thus this defense is not relevant to the case at bar.

### THE COURT ENTERS AN ORDER AS FOLLOWS:

1. Macy's is liable for violating the Americans with Disabilities Act, 42 U.S.C. 12101 *et seq.*, California Civil Code § 54 *et seq.*, and California Health and Safety Code § 19955 *et seq.*

2. Macy's West is ordered to take the following actions to improve access at Macy's Union Square:

(A) Prepare written materials and provide training to all responsible managers and sales associates regarding placement of merchandise in the display pads to ensure that access is maximized Designate a party responsible for overseeing this process and for reviewing display pads on an ongoing basis. This person or persons shall also have responsibility for ensuring that main and secondary aisles remain passable. Department Managers shall be informed as to the existence and identity of this person or persons and customers with disabilities shall be provided with that information upon request. Provide within sixty (60) days of the date of this order a complete control over vendor shops.

plan for effective customer service for customers with mobility disabilities, including signage informing such patrons of the availability of such service.

(B) In those areas of the store not subject to new construction/alterations standards, make at least one fitting room in each distinct functional sales area, and any unique features such as bridal registries, fully ADAAG/ Title 24 accessible to patrons with mobility disabilities, and provide at least one clearly accessible route to each such feature from the main aisles.

(C) In those areas of the store not subject to new construction/alterations standards, provide auxiliary (fold-out) shelves at all inaccessible counters or ensure that clipboards are available at every counter that fails to provide an area 36″ wide that is no more than 36″ above the floor, and that such clipboards are actually offered to patrons with disabilities.

(D) In those areas of the store that are subject to new construction/alterations standards, bring all non-compliant entrances, counters, fitting rooms, bridal registries, and other features used by customers into compliance with ADAAG and Title 24 standards. The maximum height of accessible counter sections shall be 36″.

(E) Bring all restrooms serving areas of new construction/alteration into compliance with ADAAG and Title 24 standards for accessible features.

(F) Make at least one primary entrance serving each area of alteration/ new construction fully ADAAG/ Title 24 compliant.

(G) Provide signage as needed throughout Macy's Union Square identifying the location of access features such as elevators, accessible restrooms, accessible fitting rooms, and accessible telephones.

3. The parties shall meet and confer to develop a compliance plan to ensure that Macy's begins to meet its obligations under the ADA and Title 24 as described above. The parties shall submit such compliance plan within sixty (60) days of the date of this order, and a status conference will be set by the court to review the progress of the parties and determine whether further steps are necessary or appropriate.

4. The parties also shall meet and confer to develop a proposal for Phase II of this action in which plaintiffs and class members will present claims for damages based on this finding of liability and pursuant to California's minimum statutory damages provisions. The parties shall each submit a proposal for Phase II within sixty (60) days, and a status conference will be set by the court to review the proposals and set dates for Phase II to proceed.

5. Plaintiffs shall be permitted to file within sixty (60) days of the date of this order a motion for attorneys' fees and costs incurred by plaintiffs in bringing Phase I of this action.

IT IS SO ORDERED.